IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DARRYL GILBERT,<br><br>    Plaintiff,<br><br>v.<br><br>KIMBERLY-CLARK PENNSYLVANIA, LLC,<br><br>    Defendant. | CIVIL ACTION<br>NO. 16-6602 |

## OPINION

Slomsky, J.                                                                                                                                                                           October 24, 2018

## I.  INTRODUCTION

Plaintiff Darryl Gilbert ("Plaintiff" or "Gilbert") brings this suit against his former employer, Defendant Kimberly-Clark Pennsylvania, LLC ("Defendant" or "Kimberly-Clark"), alleging disability discrimination under Section 12112(a) of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, et seq., and disability discrimination, retaliation, and aiding and abetting under Section 955 of the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951, et seq. (Doc. No. 1.) Plaintiff claims Defendant discriminated and retaliated against him by denying his request for short-term medical leave and terminating his employment after suffering an attack of gout.

Plaintiff asserts in his Complaint four claims against Defendant. In Counts I and II, Plaintiff alleges that Kimberly-Clark discriminated against him on the basis of his disability in violation of the ADA and PHRA, respectively. (Id. ¶¶ 41-49.) In Count III, Plaintiff alleges retaliation in violation of Section 955(d) of the PHRA. (Id. ¶¶ 50-52.) In Count IV, Plaintiff

1

alleges a claim for aiding and abetting in violation of Section 955(e) of the PHRA. (Id. ¶¶ 53-55.)

On June 4, 2018, Kimberly-Clark filed a Motion for Summary Judgment. (Doc. No. 28.) Plaintiff filed a Response in Opposition on June 25, 2018. (Doc. No. 31.) Defendant filed a Reply on July 2, 2018. (Doc. No. 32.) The Motion is now ripe for disposition. For reasons that follow, Kimberly-Clark's Motion will be granted in part and denied in part.

## II. FACTUAL BACKGROUND

Plaintiff started working for Kimberly-Clark on October 24, 1988 as a "Storeroom Clerk." (Doc. No. 1 ¶ 17.) He later became a "Level 3" employee stationed at the receiving dock of Defendant's Chester, Pennsylvania facility. (Id. ¶ 18; Doc. No. 28-1 ¶ 1.) At the receiving dock, Plaintiff was responsible for, inter alia, operating a forklift to unload semi-trailer trucks, unloading packages, and entering data into Kimberly-Clark's computer system. (Doc. No. 28-1 ¶ 2.)

In 2000, Plaintiff was diagnosed with gout.[1] (Id. ¶ 4.) Since that time, Plaintiff has suffered several gout attacks, during which he has difficulty doing everyday activities such as walking, running, thinking, and concentrating. (Doc. No. 28-1 ¶ 5; Doc. No. 31-3 at 18:1-22:13.) At times, Plaintiff's gout has particularly impacted his ability to work.[2]

---

[1] Gout is a "metabolic disease marked by a painful inflammation of the joints, deposits of urates in and around the joints, and usually an excessive amount of uric acid in the blood." *Gout*, MERRIAM-WEBSTER (Oct. 1, 2018), https://www.merriam-webster.com/dictionary/gout.

[2] Aside from needing time off from work to recover from the gout attacks, Plaintiff has required accommodations from Defendant. For example, in 2005, Plaintiff complained to his supervisor, Edward Schmidt, about the cold temperature on the receiving dock, which Plaintiff believed exacerbated his gout symptoms. (Doc. No. 31-3 at 16:16-20, 59:2-21.) Plaintiff therefore requested that a heater be installed on the dock. (Doc. 28-1 ¶ 7; Doc. 31-3 at 61:19-62:1.) Defendant installed the heater and Plaintiff experienced no further issues with the temperature. (Doc. 28-1 ¶ 8; Doc. 31-3 at 61:23-62:8.)

Between 2011 and 2014, Plaintiff's gout caused him to take several medical leaves of absence from Kimberly-Clark. (Doc. 28-1 ¶ 11; Doc. 31-3 at 36:9-23.) In each instance, it was Plaintiff's regular practice to first exhaust his accrued vacation time before putting in a request for leave, in the hope that this time would be sufficient to recover. (Doc. 31-3 at 49:1-14, 64:9-24, 65:13-20.) After exhausting his vacation time, Plaintiff would contact Prudential, Defendant's benefits administrator, to request a medical leave.[3] (Id. at 66:7-22.)

In late February 2015, Plaintiff experienced a flare-up of gout that rendered him unable to work. (Doc. No. 28-1 ¶ 21.) Like the aftermath of prior attacks, Plaintiff initially missed work by using his accrued vacation time, keeping his supervisor, Edward Schmidt ("Schmidt"), up-to-date on his condition during weekly status calls. (Doc. No. 31-3 at 64:9-16, 67:10-12.) Plaintiff exhausted his vacation time on March 30, 2015, but was not yet able to return to work. (Doc. No. 28-1 ¶ 23; Doc. No. 31-3 at 67:17-68:11.) On April 20, 2015, Plaintiff spoke with Diane Volpe ("Volpe"), Defendant's occupational health nurse, about taking medical leave from Prudential. (Doc. No. 28-1 ¶ 28; Doc. No. 31-3 at 83:17-86:10.)

Consistent with Volpe's instruction, on April 30, 2015, Plaintiff contacted Prudential to request leave. (Doc. No. 28-1 ¶ 29.) Also on April 30, 2015, Prudential sent Plaintiff a letter informing him that it had faxed its requisite "Attending Physician Statement" to Plaintiff's physician. (Doc. No. 31-9.) Prudential requested that Plaintiff follow up with his physician by

---

[3] For example, Plaintiff required vacation/leave time in July 2013 for a gout attack. (Doc. No. 28-1 ¶ 16; Doc. No. 31-3 at 38:6-20.) At that time and pursuant to Prudential's policies, Plaintiff had his physician submit medical documentation to Prudential so that Prudential could certify his leave. (Doc. No. 31-3 at 38:24-39:21.) Upon receipt of Plaintiff's medical documentation, Prudential approved his request and, on October 1, 2013, Plaintiff returned to work with no limitations. (Id. at 46:14-23.)

May 30, 2015 to ensure the Attending Physician Statement had been returned. (Doc. No. 28-1 ¶ 30; Doc. No. 31-9.)

In the interim, Defendant's HR Contact Center notified Nurse Volpe in an Individual Report dated May 4, 2015 that it was placing Plaintiff on an unpaid leave of absence pending Prudential's approval of his leave request. (Doc. No. 31-10.) The May 4, 2015 Individual Encounter Report stated, in part:

> The employee noted above has requested disability leave beginning 03/30/2015. According to the Kimberly-Clark policy as the employee has been out on leave for more than 30 days without certification, please confirm if we need to place the employee on Unpaid leave in the system. Once we receive approval from Prudential we would update the records accordingly.

(Id.) Then, in a June 3, 2015 conference call, Defendant notified Volpe that Plaintiff was still out of work without certified leave. (Doc. No. 31-11.) Following that call, on June 5, 2015, Volpe contacted Plaintiff to explain that Prudential had not yet certified his leave. (Doc. No. 31-12.) Volpe told Plaintiff that he must submit to Prudential the Attending Physician Statement, along with medical documentation supporting the duration of his gout attack. (Doc. No. 31-12; Doc. No. 28-1 ¶ 33; Doc. No. 31-3 at 106:5-107:11, 114:5-115:21.)

On June 10, 2015, after Volpe's call, Plaintiff sought treatment for his gout at the Kennedy Health System emergency room and faxed a record of the visit to Defendant. (Doc. No. 28-1 ¶ 34; Doc. No. 31-3 at 121:12-18.) The emergency room record did not contain what Prudential required. It did not state that gout was the cause of Plaintiff being out of work since March 30, 2015, nor did it state when Plaintiff might be able to return to work. (Doc. No. 31-14.)

On June 18, 2015, Plaintiff followed up with a visit to his personal physician, Dr. Richard Brantz, D.O. (Doc. No. 28-1 ¶ 37; Doc. No. 31-17.) Plaintiff then sent Prudential the Attending

4

Physician Statement signed by Dr. Brantz on June 25, 2015. (Doc. No. 31-17.) In the paperwork submitted to Prudential, Dr. Brantz discussed Plaintiff's gout symptoms as they were on June 18, 2015, and predicted that Plaintiff would be able to return to work in four weeks, on July 18, 2015. (Id.) Dr. Brantz did not reference or discuss Plaintiff's gout symptoms from March 30, 2015 to June 18, 2015. (Id.)

On June 19, 2015, one day after Plaintiff's visit with Dr. Brantz but before the Attending Physician Statement had been sent to Prudential, Defendant's HR Contact Center notified Volpe that Prudential had denied Plaintiff's claim for medical leave. Specifically, Defendant's Individual Encounter report dated June 19, 2015 stated, in part:

> The employee noted above had filed a disability claim with Prudential beginning 03/30/2015.
>
> Prudential had denied the claim for the employee. We had mailed the FMLA paperwork to the employee to cover the absences under FMLA.
>
> We did not receive the required documents from the employee and/or the employee's physician by the deadline; therefore, the leave request is denied as FMLA.

(Doc. No. 31-16.)

On June 25, 2015, despite this notice of Prudential's denial, Plaintiff received a letter from Patti Langdon ("Langdon"), the Labor Relations Specialist at Kimberly-Clark. (Doc. No. 28-1 ¶ 39; Doc. No. 31-19.) Langdon's letter informed Plaintiff that he was on an unapproved leave from work since he had "failed to provide any medical certification to Prudential." (Doc. No. 31-19.) Langdon's letter further noted that Plaintiff "must provide the medical certification to Prudential as soon as possible to ensure [his] employment is not administratively ended" and that failure to do so and/or contact Langdon by July 6, 2015 "will indicate to [Kimberly-Clark] that you have abandoned your position at the K-C Chester Mill." (Id.)

5

On July 2, 2015, Plaintiff called Langdon to discuss the next step required for Prudential to certify his leave. (Doc. No. 28-1 ¶ 43; Doc. No. 31-5 at 19:23-20:8.) Langdon instructed Plaintiff to submit to Prudential by July 9, 2015 supporting medical documentation for his absence beginning on March 30, 2015. (Doc. No. 28-1 ¶ 43; Doc. No. 31-5 at 20:1-8.) Plaintiff failed to do so. (Doc. No. 31-20.) Accordingly, Prudential denied Plaintiff's claim for disability by letter dated July 10, 2015. (Doc. No. 31-20.) Prudential's letter acknowledged receipt of Dr. Brantz's Attending Physician Statement, but cited as the reason for denial "no medical records to indicate what restrictions or limitations precluded [Plaintiff] from returning to work as of [his] date of disability March 30, 2015." (Id.)

On July 20, 2015, Kimberly-Clark terminated Plaintiff's employment for violation of the company's attendance policy, and notified Plaintiff it was terminating him because he had been on an unexcused leave of absence since March 30, 2015. (Doc. No. 31-22.)

On July 30, 2015, Plaintiff submitted an Intake Questionnaire to the U.S. Equal Employment Opportunity Commission ("EEOC") claiming that Defendant had discriminated against him on the basis of his race and disability. (Doc. No. 31-23.) On December 23, 2015, after retaining counsel, Plaintiff's counsel faxed a letter to the EEOC with the subject line "Amended Charge." (Doc. No. 31-24.) The "Amended Charge" letter detailed Plaintiff's allegations of disability discrimination by Defendant. (Id.) On February 1, 2016, Plaintiff's counsel sent a follow-up letter to the EEOC, seeking to "clarify" Plaintiff's request that the EEOC dual file his charge of discrimination with the Pennsylvania Human Relations Commission ("PHRC"). (Doc. No. 31-25.)

By letter dated April 11, 2016, the EEOC acknowledged receipt of Plaintiff's December 23, 2015 letter containing the "Amended Charge" and confirmed that it was being docketed as

received as of December 28, 2015. (Doc. No. 31-26.) The EEOC further advised Plaintiff that, prior to December 28, 2015, it had "no record of receiving any correspondence" from him. (Id.) Accordingly, the EEOC requested that Plaintiff submit a signed and verified charge so that it could proceed with an investigation into his complaints. (Id.)

As requested, Plaintiff filed a formal Charge of Discrimination with the EEOC on April 21, 2016. (Doc. No. 31-28.) In it, Plaintiff alleged that Defendant had discriminated and retaliated against him on the basis of his disability.[4] (Id.) On April 24, 2016, Plaintiff also submitted to the EEOC his signed "Information for Complainants & Election Option to Dual File With The Pennsylvania Human Relations Commission" form, which set forth his official request that the EEOC dual-file his charge with the PHRC. (Doc. No. 31-27.)

## III. STANDARD OF REVIEW

Granting summary judgment is an extraordinary remedy. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In reaching this decision, the court must determine whether "the pleadings, depositions, answers to interrogatories, admissions, and affidavits show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Favata v. Seidel, 511 F. App'x 155, 158 (3d Cir. 2013) (quoting Azur v. Chase Bank, USA, Nat'l Ass'n, 601 F.3d 212, 216 (3d Cir. 2010)). A disputed issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party. Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). For a fact to be considered "material," it "must have the potential to alter the outcome of the case." Favata,

---

[4] While Plaintiff's Intake Questionnaire (Doc. No. 31-23) alleged discrimination and retaliation on the basis of disability and race, Plaintiff's formal charge (Doc. No. 31-28) alleges discrimination and retaliation only on the basis of his disability.

7

511 F. App'x at 158. Once the proponent of summary judgment "points to evidence demonstrating no issue of material fact exists, the non-moving party has the duty to set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor." Id. (quoting Azur, 601 F.3d at 216).

In deciding a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." Id. (alteration in original) (quoting Chambers ex rel. Chambers v. Sch. Dist. of Philadelphia Bd. of Educ., 587 F.3d 176, 181 (3d Cir. 2009)). The Court's task is not to resolve disputed issues of fact, but to determine whether there exist any factual issues to be tried. Anderson, 477 U.S. at 247–249. Whenever a factual issue arises which cannot be resolved without a credibility determination, at this stage the Court must credit the nonmoving party's evidence over that presented by the moving party. Id. at 255. If there is no factual issue, and if only one reasonable conclusion could arise from the record regarding the potential outcome under the governing law, summary judgment must be awarded in favor of the moving party. Id. at 250.

## IV.  ANALYSIS

In Count I of the Complaint, Plaintiff alleges that Defendant discriminated against him on the basis of his disability in violation of the ADA. (Doc. No. 1 ¶¶ 41-45). Plaintiff raises a parallel claim under the PHRA in Count II. (Doc. No. 1 ¶¶ 46-49.) In Count III, Plaintiff alleges that Defendant violated the PHRA by retaliating against him for his opposition to Defendant's allegedly "unlawful employment practices." (Id. ¶¶ 50-52.) Finally, in Count IV, Plaintiff alleges that Defendant aided and abetted its employees in violating Plaintiff's rights under the PHRA. (Id. ¶¶ 53-55.)

Defendant argues it is entitled to judgment as a matter of law on all Counts. On Count I, Defendant asserts that Plaintiff's claim fails since (1) Plaintiff is not a "qualified individual" as

defined by the statute, (2) Kimberly-Clark had a legitimate, nondiscriminatory reason for terminating Plaintiff's employment, and (3) Plaintiff presented no evidence demonstrating that Defendant's legitimate reason for his termination was pretext. (Doc. No. 28-2 at 9-10.) On Counts II, III, and IV, Defendant argues that Plaintiff's claims under the PHRA are time-barred since Plaintiff failed to file his EEOC charge within 180 days of Defendant terminating his employment. (Id. at 17.) On Counts III and IV, Defendant further argues that Plaintiff has failed to establish retaliation and aiding and abetting claims under the PHRA. (Id. at 18-23.)

### A. Genuine Issues of Material Fact Preclude Summary Judgment on Count I – Disability Discrimination under the ADA

The ADA prohibits an employer from, among other things, "discriminat[ing] against a qualified individual on the basis of disability in regard to . . . discharge of employees . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Absent direct evidence of discrimination, a plaintiff asserting an ADA claim for discrimination may proceed under the familiar burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). See, e.g., Dellapenna v. Tredyffrin/Easttown School Dist., 449 F. App'x 209, 213 (3d Cir.2011). Under McDonnell Douglas, the plaintiff has the initial burden of establishing a prima facie case of discrimination. 411 U.S. at 802. If the plaintiff can successfully establish a prima facie case, the burden shifts to the defendant-employer to put forth a non-discriminatory reason for the adverse action. Id. The Third Circuit has held that this is a "relatively light burden," which is satisfied if the employer can "articulat[e] a legitimate reason for the unfavorable employment decision[.]" Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir.1994).

Once the employer has offered this legitimate reason, "the burden of production rebounds to the plaintiff, who must then show by a preponderance of the evidence that the employer's

9

explanation is pretextual[.]" Id. In order to satisfy the burden of showing pretext at the summary judgment stage, "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Id. at 764 (citations omitted). In Fuentes, the Third Circuit held that in order to demonstrate pretext:

> [T]he plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.... Rather, [she] must demonstrate such weakness, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact-finder could rationally find them "unworthy of credence," ... and hence infer "that the employer did not act for [the purported] non-discriminatory reasons."

Id. at 764-65 (internal citations omitted).

### 1. Plaintiff's Evidence Plausibly Establishes a *Prima Facie* Case of Discrimination

To establish a prima facie case of disability discrimination under the ADA, a plaintiff must establish that he (1) has a disability, (2) is a qualified individual, and (3) has suffered an adverse employment action because of that disability. Turner v. Hershey Chocolate USA, 440 F.3d 604, 611 (3d Cir. 2006) (citations omitted). Defendant does not contest that Plaintiff has a disability, nor that Plaintiff has suffered an adverse employment action because of that disability. (Doc. No. 28-2 at 10.) Instead, Defendant asserts that Plaintiff cannot establish a prima facie case of discrimination because he was not a "qualified individual" under the ADA. The Court disagrees.

A qualified individual is one "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). An individual is qualified to perform the essential functions of the job if

they (a) possess the appropriate prerequisites, and (b) have the ability to perform the essential functions of the job, with or without accommodations, at the time of the employment decision. Schneider v. Works, 223 F. Supp. 3d 308, 317 (E.D. Pa. 2016); see also 29 C.F.R. § 1630.2(n).

There is no dispute that Plaintiff possessed the prerequisites for his job. The parties disagree, however, over whether Plaintiff could perform the essential functions of his job with a reasonable accommodation. (Doc. No. 28-2 at 11-13; Doc. No. 31 at 11-14.) Plaintiff contends that he could have performed the essential functions of his job had Defendant allowed him the reasonable accommodation of a short-term medical leave of absence. (Doc. No. 31 at 9-11.) Defendant protests that Plaintiff could not perform his essential functions, even if allowed a medical leave, because he was and remains permanently disabled. (Doc. No. 28-2 at 11-13.)

"A leave of absence for medical treatment may constitute a reasonable accommodation under the ADA." Sowell v. Kelly Servs., Inc., 139 F. Supp. 3d 684, 700-01 (E.D. Pa. Oct. 14, 2015) (citing Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 151 (3d Cir. 2004)). As the Third Circuit explained in Conoshenti, a short-term medical leave is a reasonable accommodation if it would "enable the employee to perform his essential job functions in the near future." 364 F.3d at 151. To that end, an indefinite and open-ended leave of absence does not qualify as a reasonable accommodation. Fogleman v. Greater Hazleton Health Alliance, 122 Fed. App'x 581 (3d Cir. 2004); Schneider, 223 F. Supp. 3d at 317; Dogmanits v. Capital Blue Corss, 413 F. Supp. 2d 452, 460-61 (E.D. Pa. 2007).

Here, Plaintiff's evidence creates a genuine issue as to whether he could have performed the essential functions of his job had Defendant allowed him a short-term medical leave of absence. Plaintiff's long history with gout demonstrates that he was able to perform the essential functions of his job if given sufficient time out of work to recover from gout attacks. (Doc. No.

11

28-1 ¶ 4.) In fact, not unlike what Plaintiff experienced in 2015, Plaintiff required a medical leave of absence for his gout in 2013. (Doc. No. 28-1 ¶¶ 16-18.) Plaintiff's July 2013 leave lasted several months, but ultimately allowed him to return to work without any restrictions or limitations. (Doc. No. 31-3 at 41:18-42:14, 46:14-23.) Nothing in the record distinguishes Plaintiff's 2015 gout attack from his attack in 2013, which Defendant accommodated with a short-term leave and after which Plaintiff made a full return to work.

Defendant argues that Plaintiff nonetheless was not qualified under the ADA because he admitted at his deposition that he has been unable to work since February 2015, thus proving that no finite leave of absence would have allowed him to return to his job. (Doc. No. 28-2 at 12.) Plaintiff also testified at his deposition, however, that his 2015 gout attack lasted approximately six months and that he has not returned to work for fear that his gout might flare up again. (Doc. No. 31-3 at 21:18-22:16, 23:16-24:8.) Thus, while Plaintiff has remained out of work since February 2015, the evidence nevertheless creates a genuine issue as to whether Plaintiff might have returned to work following a short-term leave.

Accordingly, there exists is a genuine issue of material fact as to whether Plaintiff is a qualified individual with a disability.

### 2. Kimberly-Clark Has Offered A Legitimate, Nondiscriminatory Reason For Terminating Plaintiff's Employment

Since Plaintiff has satisfied the first step of the McDonnell Douglas framework, the burden shifts to Defendant to articulate a legitimate, nondiscriminatory reason for its actions. Defendant's burden of production at this stage is "relatively light." See Fuentes, 32 F.3d at 763. Here, Kimberly-Clark submits that it terminated Plaintiff for his violation of the company's attendance policy. (Doc. No. 28-16.) Specifically, Defendant's termination letter to Plaintiff states that, because he failed to supply the requisite medical documentation to Prudential to

certify his leave, he had been on an unexcused absence from work since March 30, 2015. (Doc. No. 28-2 at 14-15; Doc. No. 28-16.) Defendant's legitimate nondiscriminatory reason is supported by the evidence of record in at least three instances.

First, Plaintiff admittedly did not submit medical documentation to Defendant until June 10, 2015, after his June 5, 2015 phone call with Volpe during which Volpe informed Plaintiff that he was on an unexcused leave. (Doc. No. 28-1 ¶ 33.) On June 10, 2015, Plaintiff sought medical treatment at the Kennedy Health System emergency room and a report of the visit was faxed to Kimberly-Clark. (Doc. No. 28-1 ¶ 34.) In the report was the first medical documentation Defendant received regarding Plaintiff's latest gout attack. The ER record failed, however, to give a reason for Plaintiff's absence from work for the months preceding his visit. (Doc. No. 31-14.)

Second, it is undisputed that Prudential received no medical documentation supporting Plaintiff's leave request until his Attending Physician Statement dated June 25, 2015—nearly three months after Plaintiff had exhausted his vacation time and sought to commence a leave of absence. (Doc. No. 28-2 ¶ 42.) Plaintiff did not treat with his physician, Dr. Brantz, until June 18, 2015, at which time Dr. Brantz noted in the Attending Physician Statement that he "expected" Plaintiff to return to work in four weeks, on July 18, 2015. (Doc. No. 31-17.) Aside from the Attending Physician Statement, Plaintiff failed to submit any other medical documentation to Prudential covering March 30, 2015 to June 18, 2015, which Prudential required to certify his leave. (Doc. No. 28-2 ¶¶ 43-45.)

Finally, Plaintiff admits that Defendant contacted him on at least two occasions to warn him that he was on an unexcused leave and that Prudential was missing necessary paperwork. (Doc. No. 31-3 at 105:16-106:9, 138:20-140:3.) Plaintiff testified in his deposition that Volpe

called to inform him on June 5, 2015 that he was on an unexcused leave of absence because he failed to comply with the Prudential certification process. (Id. at 105:16-106:9.) Next, Plaintiff testified to receiving Langdon's June 25, 2015 letter wherein she explained that he had "been absent from work without approved leave since March 30, 2015" and asked him to contact her regarding the need for him to provide medical documentation to Prudential. (Id. at 138:20-140:3; Doc. No. 28-13.) Moreover, Plaintiff does not dispute Langdon's testimony that she spoke with him on July 2, 2015 to inform him that he had to submit paperwork to Prudential to ensure his leave was certified. (Doc. No. 31-5 at 19:16-20:25.)

Defendant terminated Plaintiff on July 20, 2015 (Doc. No. 28-16)—after Plaintiff failed to submit requisite medical documentation to Prudential, after Dr. Brantz anticipated that Plaintiff would be able to return to work, and after Prudential notified Plaintiff that his request for leave had been denied. (Doc. No. 28-14.) Accordingly, Defendant has met its burden of producing a legitimate and nondiscriminatory reason for terminating Plaintiff's employment.

### 3. Plaintiff Has Presented Evidence Suggesting That Kimberly-Clark's Legitimate Nondiscriminatory Reason Is Pretextual

In order to survive a motion for summary judgment after Defendant has articulated a legitimate, non-discriminatory reason for its adverse employment action, Plaintiff must produce "sufficient evidence to raise a genuine issue of fact as to whether the employer's proffered reasons were not its true reasons for the challenged employment action." Petrikonis v. Wilkes-Barre Hosp. Co., LLC, No. 11-280, 2013 WL 5877000 (M.D. Pa. Oct. 30, 2013), aff'd, 582 F. App'x 126 (3d Cir. 2014) (quoting Harding v. CareerBuilder, LLC, 168 F. App'x 535, 538 (3d Cir. 2006)). To that end, as noted, Plaintiff must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and

14

hence infer that the employer did not act for the asserted nondiscriminatory reasons." Fuentes, 32 F.3d at 765 (internal quotation marks omitted) (citing Josey v. John R. Hollingsworth Corp., 996 F.2d 632, 638 (3d Cir.1993)).

Here, Plaintiff has produced evidence tending to show a genuine issue as to whether Defendant's legitimate reason for terminating his employment was pretext for discrimination. (See Doc. No. 31 at 15-17.) To show pretext, Plaintiff relies on (1) Defendant's May 4, 2015 Individual Encounter report, (2) Defendant's June 19, 2015 Individual Encounter report, and (3) a text message referring to Plaintiff's supervisor's desire to have him terminated. (Id.) As explained below, this evidence, taken together, sufficiently creates a genuine issue as to whether Defendant's legitimate nondiscriminatory reason was pretext for discrimination.

First, Plaintiff contends that Defendant's May 4, 2015 Individual Encounter report establishes that Defendant knew about Plaintiff's unapproved leave and purposefully delayed contacting him about it until June 5, 2015. (Id. at 16.) The May 4, 2015 Individual Encounter report states as follows:

> The employee noted above has requested disability leave beginning 03/30/2015.
>
> According to the Kimberly-Clark policy as the employee has been out on leave for more than 30 days without certification, please confirm if we need to place the employee on Unpaid leave in the system. Once we receive an approval from Prudential we would update the records accordingly.

(Doc. No. 31-10.) Despite receiving this report, Volpe failed to follow up with Plaintiff about his certification until over a month later, on June 5, 2015. And while Plaintiff did not initiate the disability process with Prudential until April 30, 2015, Volpe had and forewent every opportunity to contact Plaintiff about his leave between May 4, 2015 and June 5, 2015. (Doc. No. 28-1 ¶ 29.)

In addition, Plaintiff asserts that Defendant's June 19, 2015 Individual Encounter report informing Volpe that Plaintiff's claim to Prudential had been denied, rendered disingenuous

Defendant's later effort to contact him about getting his leave certified. (Doc. No. 31 at 16-17.) Plaintiff takes issue with Langdon's letter to him dated June 25, 2015, in which she requests that Plaintiff contact her about certifying his leave with Prudential. (Doc. No. 31-19.) A review of Langdon's letter shows contradictions with the information discovered by Defendant in the June 19, 2015 Individual Encounter report. (Doc. No. 31-19.) For example, the letter states, in part:

> It has come to my attention that you have been absent from work without approved leave since March 30, 2015 when the last of your vacation allotment expired. Since that time, we can find no record of you calling off, ***nor have we received any indication that Prudential has certified the time you have been out of work***.
>
> \* \* \*
>
> I am requesting that you contact me at 610-499-6586 by Monday, July 6, 2015. The objective of this call is to determine your intentions regarding your employment at the K-C Chester Mill and ***setting in place a plan for resolving the current situation***.

(Id.) (emphasis added). The plain language of this letter suggests that Prudential had not yet denied Plaintiff's disability claim—something Defendant knew to be false by virtue of the Individual Encounter report dated June 19, 2015 stating the opposite.

Finally, Plaintiff argues that Defendant's proffered reason for terminating his employment is pretextual because Defendant's employees spoke about their desire to have Plaintiff terminated around the same time he was requesting medical leave. (Doc. No. 31 at 17.) Plaintiff points to a text message sent by retired Kimberly-Clark employee, Kathy Pretti, to Plaintiff's supervisor, Schmidt. (Id.; Doc. No. 31-18.) Pretti's message reads: "Saw Rob Nader last week, he told me Tom Brooks wants to have Darryl fired. Is he still missing time."[5] (Doc. No. 31-18 at 4.) This message, in conjunction with Plaintiff's argument that Kimberly-Clark wanted him fired, raises

---

5   Tom Brooks was Kimberly-Clark's "team leader" for Plaintiff's and Schmidt's department. (Doc. No. 31-4 at 28:17-19.)

an issue of fact for the factfinder to determine whether Defendant had a discriminatory ulterior motive for terminating Plaintiff's employment.

Plaintiff's evidence, taken together, creates a genuine issue as to whether Defendant's legitimate nondiscriminatory reason for terminating his employment is pretext for discrimination. Accordingly, Defendant's Motion (Doc. No. 28) will be denied as to Count I.

### B. Plaintiff's Claims under the PHRA are Untimely and Defendant is Entitled to a Judgment as a Matter of Law on Counts II, III, and IV

Plaintiff contends that he timely filed his claims against Defendant under the PHRA for discrimination (Count II), retaliation (Count III), and aiding and abetting (Count IV) within 180 days of his termination by virtue of his December 28, 2015 "Amended Charge" with the EEOC. (Doc. No. 31 at 19-21.) The Court disagrees.

To bring a claim under the PHRA, a plaintiff must file an administrative complaint with the Pennsylvania Human Relations Commission ("PHRC") within 180 days of the challenged employment action before he can proceed with filing a claim in court. 43 P.S. § 959(h); Woodson v. Scott Paper Co., 109 F.3d 913, 925 (3d Cir. 2007). Pennsylvania courts strictly enforce this 180-day requirement. Woodson, 109 F.3d at 925. A plaintiff need not file a complaint directly with the PHRC—the transmittal of their EEOC complaint to the PHRC will suffice as a filing of a verified complaint under the PHRA. Tlush v. Mfgs. Res. Ctr., 315 F. Supp. 2d 650, 656 (E.D. Pa. July 24, 2002). If a plaintiff wishes to dual file, "the complaint will be deemed filed with both agencies on the date the election to dual file the charge is made." Ellingsworth v. Hartford Fire Ins. Co., 247 F. Supp. 3d 546, 558 (E.D. Pa. 2017).

Here, the parties dispute when Plaintiff filed his charge with the EEOC. Plaintiff contends that he filed on July 30, 2015 when he submitted his EEOC "Intake Questionnaire," and further contends that any subsequent correspondence with the EEOC constitutes an

amendment to that original charge. (Doc. No. 31 at 19-20.) Defendant argues that Plaintiff did not file until May 5, 2016, when the EEOC received Plaintiff's formal charge dated April 21, 2016. (Doc. No. 28-2 at 17-18.) The Court need not resolve whether Plaintiff's Intake Questionnaire qualifies as his formal charge, however, because the earliest date on which Plaintiff elected to dual file with the PHRC was on February 1, 2016, 196 days past his termination from Defendant.

On February 1, 2016, Plaintiff's counsel sent a letter to the EEOC stating:

> As you are aware, Claimant filed his Original EEOC Charge on July 30, 2015 and his Amended EEOC Charge on December 23, 2015. Claimant stated that he wanted the Charge dual filed with the State or Local Agency. To be absolutely clear, please submit Claimant's EOOC charge for dual filing with the Pennsylvania Human Relations Commission if not already done. Thank you for your assistance in this regard.

(Doc. No. 31-25.) As referenced in the February 1, 2016 letter, Plaintiff's only prior submissions to the EEOC were his July 30, 2015 Intake Questionnaire and his counsel's December 23, 2015 letter with the subject line "Amended Charge." Upon careful review of both items, neither one indicates a request that Plaintiff's "charge" be filed with the PHRC. (Doc. Nos. 31-23 & 31-24.)

The EEOC's letter to Plaintiff's counsel dated April 11, 2016 further confirms that neither Plaintiff's Intake Questionnaire, nor his December 23, 2015 "Amended Charge" sent to the EEOC show an election to dual file by Plaintiff. (Doc. No. 31-26.) Specifically, the EEOC's letter states:

> Please note additionally that since the Respondent named in the charge is located within the Commonwealth of Pennsylvania and the most recent violation is within 180 days of the date the original correspondence was received by EEOC, your client must complete the enclosed form from the Pennsylvania Human Relations Commission ("PHRC") to indicate their interest in preserving Pennsylvania state rights. Your client should indicate whether or not they wish the charge to be dual-filed with the PHRC (by signing one line only) and return the signed form to the EEOC along with the signed charge form(s)

18

(Id.) The letter makes clear that the EEOC had no record of Plaintiff's request to dual-file prior to December 28, 2015.

Since the earliest date on which Plaintiff elected to dual file with the PHRC was February 1, 2016, 196 days past his date of termination and 16 days past the 180-day deadline under the PHRA, Plaintiff's PHRA claims are untimely and warrant dismissal. Accordingly, Defendant's Motion for Summary Judgment (Doc. No. 28) will be granted on Counts II, III, and IV.

## V. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment on Count I will be denied, and granted on Counts II, III, and IV. An appropriate Order follows.